J-A18015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 308 WDA 2023 |

Appeal from the Order Entered February 15, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000034-2022

BEFORE: BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: November 8, 2023**

W.W. ("Mother") appeals from the order entered on February 15, 2023, in the Court of Common Pleas of Allegheny County, involuntarily terminating her parental rights to her daughter, S.W. ("Child"), born in September 2020.[1] Upon careful review, we affirm.

On March 31, 2022, Allegheny County Office of Children, Youth & Families ("CYF") filed a petition for the involuntary termination of Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The court held an evidentiary hearing on January 27, 2023, when Child was

---

[1] By the same order, the orphans' court involuntarily terminated the parental rights of any unknown father with respect to Child. No purported father filed an appeal or participated in the instant appeal.

two years old.[2]  Child's court-appointed counsel represented both her legal and best interests.[3]

CYF presented the testimony of its caseworker, Ronnie Tustin; court-appointed psychologist, Gregory A. Lobb, Ph.D., who performed an interactional evaluation of Child and Mother as well as an individual evaluation of Mother, among other things; and another court-appointed psychologist, Beth A. Bliss, Psy.D., who performed an Intelligence Quotient ("IQ") test on Mother as well as interactional evaluations between (1) Mother and Child and (2) current foster parents and Child.  In addition, CYF introduced, and the court admitted, Dr. Lobb's reports dated August 8, 2021, and May 9, 2022, as CYF Exhibit 1; and Dr. Bliss's reports dated October 18, 2021, and January 20, 2023, as CYF Exhibit 4, *inter alia*.  Mother testified on her own behalf and adduced the testimony of Nicole Dardia, the in-home specialist at Family Resources who helped Mother obtain various services.

The relevant factual and procedural history is as follows.  CYF became aware of Mother approximately one month after Child's birth.  On October 13, 2020, CYF received a general protective service report that raised concerns

_____

[2] The Honorable Eleanor L. Bush presided over the termination of parental rights proceeding as well as the underlying dependency matter.

[3] Insomuch as Child's legal interests were incapable of ascertainment due to her young age, the court did not appoint separate legal counsel for Child. **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied).

about Mother's mental health and indicated that she required assistance caring for Child. *See* N.T., 1/27/23, at 46; *see also* CYF Exhibit 2 (Dependency Orders).

Two days later, CYF performed a home visit. *See* N.T. at 46. According to Ms. Tustin, it appeared Mother was experiencing visual and auditory hallucinations: (1) Mother deconstructed Child's crib because she saw red eyes in it; (2) Mother reported that the lights were making a clicking sound despite the caseworker not hearing anything; and (3) Mother reported "bad vibes" from inanimate objects. *See id.* at 50. CYF also learned that Mother has a history of untreated mental health issues. *See id.* at 64. Additionally, Mother revealed that she was feeding Child, who was merely one month old, inappropriate food for Child's age, and during the visit, left Child with the caseworker to do her laundry. *See id.* at 51.

The same day, Mother was taken to a psychiatric hospital for evaluation. *See id.* Thereafter, CYF obtained emergency protective custody of Child. At this time, CYF performed an examination of Child. *See id.* at 53. The evaluation revealed skin breakdown in Child's groin area and that Child had not been gaining weight since she was born. *See id.*

Following a shelter care hearing on October 21, 2020, Child remained in the care and custody of CYF. *See* CYF Exhibit 2 (Dependency Orders).

Thereafter, CYF filed a petition for dependency which was granted by the court on November 25, 2020. *See id.*[4]

In furtherance of Child's permanency goal of reunification, Mother was required to complete the following goals: (1) comply with mental health and psychiatric evaluations and follow through on the recommendations; (2) attend supervised visitation with Child; (3) follow recommendations from forensic evaluations; (4) participate in IQ testing; (5) identify safety concerns within her home; and (6) learn about Child's needs and development. *See* N.T. at 56-57.

Over the course of Child's dependency, Mother progressed from minimal compliance to substantial compliance with her objectives. However, at each permanency review hearing, the court indicated that Mother had made

---

[4] Child was initially placed, through Pressley Ridge, in the home of A.E. and A.E. ("former foster parents"). N.T. at 54. On July 6, 2022, the court held a permanency review hearing where multiple service providers raised concerns about former foster parents based on Dr. Lobb's forensic report dated May 9, 2022. *See* CYF Exhibit 1 (Dr. Lobb's Reports).

Thereafter, CYF filed a motion requesting to move Child to a new foster home. On August 26, 2022, the court conducted a hearing, and, by order of the same date, the court granted CYF's motion. *See* CYF Exhibit 2 (Dependency Orders). As such, Child was placed with a new pre-adoptive foster family ("current foster parents") on September 6, 2022. *See* N.T. at 54.

Following Child's removal, former foster parents filed a motion to intervene which, following oral argument, the court denied by order dated November 8, 2022. *See id.* Former foster parents appealed this order. Their appeal is docketed at 22 WDA 2023, and we dispose of it by separate memorandum.

minimal progress toward alleviating the circumstances which necessitated Child's original placement. The court repeatedly found that Mother "exhibits little understanding of the reasons why Child is in foster care." CYF Exhibit 2 (Dependency Orders). Indeed, Ms. Tustin, CYF caseworker, testified that Mother "consistently reports to me that she does not understand the need for mental health [treatment] and that she is, quote, not crazy." N.T. at 71. Dr. Lobb confirmed that he does not believe Mother is aware of her limitations. *See id.* at 21.

By order dated January 27, 2023, and entered on February 15, 2023, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b). On March 14, 2023, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The court filed its Rule 1925(a) opinion on April 17, 2023.

> On appeal, Mother presents the following issues for review:
>
> 1. Did Mother waive her right to challenge the trial court's decision to terminate her parental rights under 23 Pa.C.S. § 2511(a)(2)?
>
> 2. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (8)?
>
> 3. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6 (issues reordered for ease of disposition).[5]

We consider Mother's claims in the context of determining whether the involuntary termination order is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Our Supreme Court has explained, "[a]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–24.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act ("Act"), which requires a bifurcated analysis.

---

[5] Child's attorney filed a brief in this appeal advocating for affirming the termination order. *See* N.T. at 176-78.

23 Pa.C.S. § 2511. Initially, the trial court must determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the relevant provisions of the Act are Section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).[6]

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct. We have explained, "[a] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *Matter of Adoption of C.A.W.*, 683 A.2d 911, 914–15 (Pa. Super. 1996) (citation omitted).

With respect to Section 2511(b), the court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Regarding the "emotional needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section

---

[6] The court also terminated Mother's parental rights pursuant to Section 2511(a)(8). However, this Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

2511(b) should include, in part, the child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023).

> The High Court recently explained:
>
> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. ***See E.M.***, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

***K.T.***, 296 A.3d at 1109-10 (some citations omitted).

As such, the ***K.T.*** Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. ***Id.*** at 1111. Specifically, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." ***Id.***

Moreover, in reiterating that the parental bond is only one part of the analysis, the ***K.T.*** Court held that the "Section 2511(b) inquiry must also

include consideration … [of] certain evidence **if it is present in the record**." *Id.* at 1113 n.28 (emphasis in original). The specific evidence at issue in *K.T.* related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. *Id.* at 1112. The Court emphasized, however, that these foregoing factors were not an exhaustive list for consideration under all Section 2511(b) analyses. *Id.* at 1113 n.28. Rather, the *K.T.* Court found, as noted above, that the particular facts of each case determine the factors to be considered.

The Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014).

In Mother's first issue, she contends that she did not waive her argument under 23 Pa.C.S. § 2511(a)(2). In its Rule 1925(a) opinion, the orphans' court concluded that Mother waived any challenge regarding Section 2511(a)(2) because she did not assert an error regarding her repeated and continued **incapacity**. *See* Orphans' Court Opinion ("OCO"), 4/17/23, at 10-

11. Rather, Mother asserted an error only with respect to the court's finding that her conduct demonstrated repeated and continued **abuse, neglect, or refusal**. *See id.*

> Mother's Rule 1925(b) statement declares the following:

> The trial court abused its discretion and/or erred as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (8). There was not clear and convincing evidence of **abuse, refusal, or neglect** by Mother. The conditions which led to the removal of the child no longer exist and termination of the parental rights of Mother would not serve the needs and welfare of Child.

> Rule 1925(b) statement, 3/14/23 (emphasis added).

> Our Supreme Court has held:

> The purpose of a Rule 1925(b) statement is to facilitate appellate review and to provide the parties and the public with the legal basis for a judicial decision. To this end, Rule 1925(b)(4)(ii) provides that the Rule 1925(b) statement "shall **concisely** identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). Highlighting this need for conciseness, Rule 1925(b)(4)(iv) indicates that the Rule 1925(b) statement "should not be redundant or provide lengthy explanations as to any error." Pa.R.A.P. 1925(b)(4)(iv). On the other hand, the Rule 1925(b) statement cannot be too concise, as it must properly specify the errors to be addressed on appeal. … Pursuant to Rule 1925(b)(5)(vii), "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."

> To ensure that a Rule 1925(b) statement is both concise but also sufficiently detailed to identify all of the issues desired to be raised on appeal, Rule 1925(b)(4)(v) provides that "[e]ach error identified in the Statement will be deemed to include every **subsidiary issue** that was raised in the trial court[.]" Pa.R.A.P. 1925(b)(4)(v) (emphasis added).

> . . .

- 11 -

> The text of these rules emphasizes that to be "subsidiary issues," the unstated issue must be "included" within the stated issue. … Conversely, an unstated issue is not subsidiary when it is separate and distinct from the stated issue.

***Commonwealth v. Price***, 284 A.3d 165, 170-71 (Pa. 2022) (citations, quotation marks, and footnote omitted); ***see also In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in the concise statement are waived).

Mother contends in her brief that "incapacity" is included within the stated issue in her Rule 1925(b) statement as she posits that the court erred in terminating her parental rights "pursuant to 23 Pa.C.S. § 2511(a)(2)." Mother's Brief at 28-29. We agree insofar as Mother's stated issue challenged the orphans' court's conclusions under Section 2511(a)(2).

Further, although Mother failed to specify "repeated and continued incapacity" in her Rule 1925(b) statement, the orphans' court nonetheless addressed the issue on the merits in its Rule 1925(a) opinion. ***See*** OCO at 11-19; ***see also Commonwealth v. Arnold***, 284 A.3d 1262, 1269 n.9 (Pa. Super. 2022) (rejecting trial court's claim that a litigant failed to preserve a claim with sufficient specificity pursuant to Rule 1925(b), where "the court's alternative analysis on the merits demonstrates that it was well-aware of the nature and scope" of the petitioner's argument). Thus, we decline to find waiver in this regard.

With her second issue, Mother argues that CYF presented insufficient evidence to support termination of her parental rights regarding any continued incapacity of Mother to provide Child essential care and that the conditions

that led to removal cannot or will not be remedied. *See* Mother's Brief at 22. Mother contends that the court erred in finding that she did not complete her goals. *See id.* at 22-23. She further posits that her participation in mental health treatment programs and coached parenting classes remedied the conditions that led to Child's removal. *See id.* at 23.

The court focused its reasoning under Section 2511(a)(2) on Mother's failure to alleviate the conditions that brought Child into care, despite completing various services. The court explained as follows:

> The [c]ourt acknowledges, and CYF concedes, that Mother has complied with required services. Despite this compliance, Mother continues to deny the need for services and displays no understanding of her diagnoses or the reason Child is in care. In sum, the evidence established that despite Mother's active participation in the services provided to her, she was unable to demonstrate mental health stability and age-appropriate parenting skills. The [c]ourt viewed this evidence in conjunction with evidence of Mother's intellectual disability, a static condition for which there is no treatment, and the impact it has on Mother's ability to manage the ever-changing needs of a developing child.

OCO at 18-19.

Ms. Tustin, CYF caseworker, testified that Child was removed from Mother's care due to concerns regarding her mental health and her inability to properly care for Child. Ms. Tustin testified as follows, on direct examination, regarding Mother's mental health at the time of removal:

> Q: So going back to the earlier question, Ms. Tustin, can you advise us, what did CYF learn in the course of its home visit on -- I think you said October 15, 2020?
>
> A: Yes. At the time it appeared that [M]other was exhibiting auditory and visual hallucinations.

Q: And was the -- were there details provided by the visiting caseworker regarding what had been observed or heard during that home visit?

A: Yes. Inside the home it was observed that the crib was not set up. Mother had reported that it was taken down [due] to seeing red eyes in the crib. Mother reported hearing and seeing things, including that the lights in the home were making a clicking noise. Mother was asked to plug those lights in, and the caseworker did not observe those same sounds. Mother had reported bad vibes coming from inanimate objects, and the couch was also observed to be [upside] down against the wall.

N.T. at 50. CYF learned that Mother was not participating in any treatment for her mental health issues. *Id.* at 64.

Accordingly, the court ordered Mother to undergo a mental health assessment, psychiatric evaluation, and follow all recommendations for treatment and medication. Following his initial individual evaluation of Mother in March 2021, Dr. Lobb diagnosed her with Unspecified Schizophrenia Spectrum[7] and Other Psychotic Disorder. *See id.* at 9-13; *see also* CYF Exhibit 1 (Dr. Lobb's Reports). Dr. Lobb recommended that Mother obtain a psychiatric evaluation to determine if medicine would be appropriate treatment. *See* N.T. at 13. He testified that "[g]enerally, those symptoms are [] thought to be responsive to medication, and first line treatment for that diagnosis is medication." *Id.* at 13-14.

Ultimately, Mother participated in a psychiatric evaluation in August 2022. Mother reported to Ms. Tustin that the evaluation did not recommend

---

[7] Dr. Lobb described the diagnosis as "a general category of somebody that may have a thought disorder and has some symptoms of psychosis or schizophrenia, auditory hallucinations, those types of things." N.T. at 13.

that she be prescribed medication. ***See id.*** at 68-69. However, Mother did not provide CYF with any documentation to confirm. ***See id.*** at 131. Ms. Tustin attempted to contact the provider of the evaluation to obtain a report but was unsuccessful. ***See id.***

Mother also repeatedly reported to Ms. Tustin that she does not understand why she needs to attend therapy. ***See id.*** at 65. She consistently stated to Ms. Tustin that she is "not crazy" and refused to acknowledge her mental health needs. ***Id.*** at 71.

Dr. Lobb emphasized the need for treatment and stated the following on direct examination:

> My concern is [Child] is very young and … without having support around her, I guess, around [Mother], my concern would be that if those symptoms were to come back and she was not under proper care with a psychiatrist and a therapist, having a mental health team, … [Child] could be at risk of being in danger because of this.

***Id.*** at 26. Dr. Lobb was also concerned with Mother's commitment to treatment:

> Q: And you indicated that [Mother] was defensive toward her symptoms or disclosing her symptoms and she was minimizing her symptoms. How can this minimization impact kind of her long-term commitment to treatment?
>
> A: I would be concerned that if the court was no longer involved, whether she would continue with treatment. If her symptoms … have remitted or have reduced for her and she is not having those symptoms, I would still, particularly with the age of [Child], and [Mother] having a history of these symptoms, I would still want her to be in treatment long-term. I think that … not having natural supports around her, a therapist could be very supportive for her, … having a psychiatrist, … she's able to follow up with who's familiar with her. If she has some sort of an increase in symptoms

- 15 -

at some point, somebody is there to intervene sooner rather than later.

*Id.* at 36-37 (cleaned up).

Dr. Bliss, who was court-appointed to perform an IQ evaluation on Mother, diagnosed her with a mild intellectual disability and noted Dr. Lobb's diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. *See* CYF Exhibit 4 (Dr. Bliss' Reports).[8] She testified that Mother would require significant support in order to meet Child's needs. *See* N.T. at 99-103. She further emphasized that therapy is not sufficient to treat Mother's mental health, as follows:

> One, that the primary mental health concern that I identified and diagnosed as well as prior individuals, from my understanding, it's related to psychosis, and so therapy is not typically the main form of treatment for any kind of psychotic disorder. It would be medication. I [am not] aware of any other mental health concerns really for her, so therapy really wouldn't be effective, especially not by itself.
>
> Additionally, there's the concern about her IQ, and again, therapy is not very effective with low IQ people. It needs to be very concrete at her level, and I'm not sure what she's receiving, if it is, but again, the research has shown that therapy is usually not very effective with low IQ individuals.

*Id.* at 107-08.

Mother failed to identify any additional supports. When Ms. Tustin asked Mother about additional support, she merely indicated that Child "needed to

---

[8] While Dr. Bliss was appointed to conduct an IQ evaluation of Mother, Dr. Bliss testified that — during that evaluation — she also noticed aspects of Mother's behavior that made Dr. Bliss concerned that Mother may have a psychotic disorder. N.T. at 104-05, 107.

be with her." *Id.* at 89. Ultimately, Mother revealed maternal grandmother as a support, but CYF assessed her and deemed her inappropriate. *See id.*

Despite Mother's participation in the various services, Ms. Tustin testified, on direct examination, that Mother's capacity to provide essential parental care for Child's physical or mental well-being has not improved:

> Q: And can you take us through what has been [Mother's] response to your -- the concerns you've raised?
>
> A: [Mother] generally [disagrees] with [CYF]. When I identify safety concerns and give her suggestions on how to rectify them, her general response is that [Child] knows better. For example, when [Child] became more mobile, it was suggested that a safety gate be placed on [Mother's] stairs, and [Mother] had reported that [Child] knew better than to try to go up the stairs.
>
> Q: Are there any other examples you can provide us?
>
> A: There was a point in time when [Mother] had moved [and] I assessed her new home. There was a pair of scissors on the floor that I suggested be picked up before the visits start, at which [Mother] also reported [Child] knew better….
>
> Q: And in the course of your observations of visits, were you able to observe whether [Mother] [was] independently … able to, I guess, determine or see or address a safety concern[]?
>
> A: Not that I have observed.

*Id.* at 79-80. Ms. Tustin further testified that Mother continued to lack knowledge of appropriate foods for Child. *Id.* at 93 ("[Child] is two years old, but there were still moments where [Mother] wanted to feed [her] formula or a bottle instead of transitioning to toddler foods…."). Mother also repeatedly failed to read Child's cues during visits. *Id.* ("Child [] became more mobile [and] would indicate that she would want down … and [Mother] was not []

interpreting those needs as [Child] was displaying them, did not want to put her down, did not want to … allow [Child] to do those things.").

The record reveals that Mother has not developed insight into her incapacities nor progressed in alleviating the circumstances that brought Child into care.  Throughout the case, Mother repeatedly questioned the need for services.  Mother merely relied on her own self-serving testimony to indicate that she does not require medication.  However, both Dr. Lobb and Dr. Bliss insisted that medication is the first line of treatment when addressing psychotic disorders.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2).  The record demonstrates that Mother's repeated and continued incapacity to acknowledge her limitations with her mental health has caused Child to be without essential parental care, control, or subsistence necessary for her physical and mental well-being.  Further, the cause of Mother's incapacity cannot or will not be remedied.

With her third issue, Mother argues that the orphans' court erred in analyzing Section 2511(b) because the court abused its discretion with respect to Section 2511(a).  *See* Mother's Brief at 26.  In the alternative, Mother argues that terminating her parental rights would be detrimental to Child because her relationship with Mother adds value to her life.  *See id.* at 26-27.

The trial court opined the following regarding its Section 2511(b) analysis:

- 18 -

In this matter, CYF conceded the existence of a bond between Mother and Child. The court assumed the existence of this bond in considering the evidence and credits Mother for her ability to develop a bond with Child while she has remained out of Mother's care. However, despite the existence of a bond between Mother and Child, the evidence supported the court's conclusion that termination of Mother's parental rights served Child's needs and welfare.

Child was removed from Mother's care at approximately one month old and has remained in care since that time. Following multiple individual evaluations of Mother and interactional evaluations of Mother and of Child's current foster parents with Child, Dr. Bliss observed Child to be "bonded and attached" to Mother but opined that Child "views foster parents as her psychological parents, looking to them when she needs extra comfort, support, or reassurance." With regard to Mother's intellectual disability, Dr. Bliss expressed concerns with Mother's ongoing ability to independently parent Child or meet her needs as she continues to develop, testifying that she would need continued support throughout Child's life to be able to effectively parent. Though she noted that Mother is not currently a risk to Child if she were to have some limited unsupervised visits, Dr. Bliss concluded that "[d]ue to her low intellectual functioning, her mental illness, and her medical issues, Mother is not currently in a position to be a primary caregiver to her daughter."

Considering whether termination of parental rights would meet Child's needs and welfare, Dr. Bliss concluded that it would, "as it is unlikely that Mother will ever be in a position to be a primary caregiver to Child[,] and she has already been placed outside of Mother's care for a significant length of time given her young age." While acknowledging that termination may have a detrimental effect on Child should she never see Mother again, Dr. Bliss opined that foster parents, given their relationship with Child, would be able to alleviate any of the negative effects Child may experience. In this same regard, Dr. Lobb testified that given the significant length of time Child has been in care, having permanency outweighs any impact termination of Mother's rights would have on Child.

Child is now two years old and has remained outside Mother's care for almost all of her life. Given Mother's ongoing inability to independently care for Child, Child's length of time in placement, and her bond with her [current foster parents], the court

- 19 -

justifiably concluded that **Child's need for safety, permanency, and stability outweighs the possible benefit to Child of maintaining her relationship with Mother.** Based on these observations and conclusions, the [c]ourt appropriately determined that termination of Mother's rights serves Child's needs and welfare.

OCO at 22-24 (cleaned up; emphasis added; footnotes omitted).

The certified record supports the orphans' court's findings. There is no dispute that Mother regularly attended supervised visitation three times per week. Further, CYF acknowledged that, during the course of her dependency, Child appeared more comfortable with Mother. *See* N.T. at 84. Dr. Bliss, after conducting interactional evaluations in January 2023, also indicated that Child appears to be attached to Mother, "at least to some degree." *Id.* at 111. However, she emphasized that Child relies on current foster parents when she needs comfort, security, and stability, as follows:

Q: So you also did an interactional with [current] foster parents and you noted in your conclusions that they were her psychological parents. So can you describe for us, what was -- you observed and noted from the interactional with these foster parents that led you to that conclusion?

A: Sure. So, again, how I define psychological parent, it's who [] the child looks to when they need extra comfort, support, reassurance. It's who they feel is going to meet their primary day-to-day needs.

. . .

And so [here], the bond and attachment that I viewed and the positive interactions during the [interactional evaluations] with the foster parents was one piece. So really that, the fact that she looked to her foster mom when she was tired, when she was done, when she needed some comforting, that was kind of a main factor in concluding that [she] was her psychological parent.

- 20 -

*Id.* at 114-16. Dr. Bliss recognized that termination of Mother's parental rights may have a detrimental effect on Child, but she opined that her relationship with current foster parents could help alleviate any negative effects she might experience. *See id.* at 119, 124; *see also K.T.*, 296 A.3d at 1114 (stating that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child"). Further, when asked by the orphans' court if Child would experience extreme emotional consequences if Mother's parental rights were terminated and Child did not see her again, Dr. Bliss opined that she did not believe Child "would experience extreme negative consequences or trauma." N.T. at 125. Relatedly, Dr. Lobb emphasized Child's need for permanency. *Id.* at 39 ("I think she does have a bond with [Mother], but … I think that not having permanency would outweigh that at this point, in my opinion.").

Despite finding some level of attachment between Mother and Child, the record supports that the bond they share is not necessary and beneficial. *See K.T.*, 296 A.3d at 1114 (concluding that "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial"). Moreover, the evidence reveals that Child has been removed from Mother's care since she was one month old, is living in a pre-adoptive home, and shares a psychological bond with her current foster parents, which is necessary for her emotional needs and welfare. We discern no abuse of discretion in the court's weighing of these factors. *See id.* at 1113 (emphasizing that "the parental bond is but one part of the overall

[Section 2511](b) analysis"); *id.* (adding that the court must also consider "other important factors such as the child's need for permanency and length of time in foster care…; whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs…").

Based on the foregoing, the record evidence amply demonstrates that the termination of Mother's parental rights will serve the developmental, emotional, and physical needs and welfare of Child. *See In re A.S.*, *supra* at 483 ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent."). Therefore, we discern no abuse of discretion by the court in terminating Mother's parental rights pursuant to Section 2511(b).

Accordingly, we affirm the order terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 11/08/2023